Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY CHIN ZHI KUANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ATARA BIOTHERAPEUTICS, INC., ANHCO THIEU NGUYEN, PASCAL TOUCHON, ERIC HYLLENGREN, and YANINA GRANT-HUERTA,<br><br>Defendants. | Case No. 2:26-cv-3083-KK-MAR<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

NATURE OF THE ACTION .......... 1
JURISDICTION AND VENUE .......... 6
PARTIES .......... 6
COMPANY BACKGROUND .......... 8
How Atara Operates and Derives Revenue .......... 8
Tab-cel and EBV+ PTLD .......... 11
The FDA BLA Approval Process .......... 13
The ALLELE Study .......... 16
Undisclosed Deficiencies in the Design, Results, and Analysis of the ALLELE Study, as Submitted in the Tab-Cel BLA Package .......... 17
DEFENDANTS MADE MISLEADING STATEMENTS ABOUT THE ALLELE STUDY AND THE TAB-CEL BLA .......... 25
The FDA Issued Its First CRL for the Tab-Cel BLA .......... 35
Defendants Continued Making Misleading Statements About .......... 36
the ALLELE Study and the Tab-Cel BLA .......... 36
PLAINTIFF AND THE CLASS WERE DAMAGED WHEN ATARA's STOCK PRICE PLUMMETED UPON DISCLOSURE OF THE 2026 CRL .......... 44
ADDITIONAL SCIENTER ALLEGATIONS .......... 46
CLASS ACTION ALLEGATIONS .......... 50
PRAYER FOR RELIEF .......... 57

Lead Plaintiff Thu Nguyen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned attorneys, alleges in this amended complaint the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (1) review and analysis of Defendants' public statements, public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding Atara Biopharmaceutics, Inc. ("Atara" or the "Company"); (2) media and analyst reports and advisories about Atara; (3) public records and information from government regulators including the U.S. Food and Drug Administration ("FDA"); and (4) other information publicly available online. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1. Plaintiff brings this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class comprising all persons and entities that purchased the publicly traded common stock of Atara between May 20, 2024 and January 9, 2026, both dates inclusive ("Class Period").[1] Plaintiff brings claims individually and on behalf of the Class pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers, directors, or control persons of Atara; any excluded person's immediate family members, legal representatives, heirs, successors, predecessors, or assigns; the present and former parents, subsidiaries, assigns, successors, predecessors, and affiliates of any Defendant; and any entity in which any excluded person or entity has or had a material ownership interest.

2. Atara is a clinical-stage biopharmaceutical company that develops therapies for patients with solid tumors, hematologic cancers, and autoimmune diseases. The Company's lead product candidate at all relevant times was tabelecleucel (also referred to as "tab-cel" or Ebvallo), a T-cell immunotherapy program for the treatment of Epstein-Barr virus positive post-transplant lymphoproliferative disease ("EBV+ PTLD").

3. Atara partnered with Pierre Fabre Médicament, a subsidiary of the Pierre Fabre Laboratories group (collectively, "Pierre Fabre"), for the commercialization of tab-cel. The Company relies primarily on payments from Pierre Fabre, conditioned upon Atara achieving specific developmental and regulatory targets for tab-cel, and sales of its stock to outside investors to fund its operations.

4. In May 2024, Atara announced its submission of a Biologics License Application ("BLA") to the U.S. Food and Drug Administration ("FDA") for tab-cel as a monotherapy for the treatment of patients two years of age and older with EBV+ PTLD who have received at least one prior therapy (the "tab-cel BLA"). The tab-cel BLA was purportedly supported by data from the Company's pivotal Phase 3 ALLELE study evaluating tab-cel as a treatment for EBV+ PTLD.

5. The sole primary endpoint for the ALLELE study was Objective Response Rate ("ORR"), calculated as the proportion of patients receiving the tab-cel treatment who achieved either complete remission ("CR") or partial remission ("PR") of their PTLD. A primary endpoint for a clinical study like the ALLELE trial is the main, pre-specified result measured to determine if a treatment works, serving as the core basis for a study's nominal success and potential regulatory approval of the treatment.

6. Throughout the Class Period, Defendants repeatedly made materially misleading public statements about the ALLELE trial, its results, and the impact on the tab-cel BLA. Specifically, Defendants failed to disclose that there were several

critical clinical deficiencies in the ALLELE study design and the analysis of its results, as submitted in the tab-cel BLA. Accordingly, there was a much higher risk than Atara disclosed to investors that the FDA would reject the tab-cel BLA based on these myriad clinical deficiencies. Defendants misleadingly underplayed that risk in their statements about the ALLELE study, the sample size for the study, the primary endpoint of the study, and the tab-cel BLA throughout the Class Period.

7. Those misrepresentations continued before and after Atara received a complete response letter ("CRL") from the FDA in January 2025, denying approval of the tab-cel BLA due to issues with a third-party manufacturer failing to comply with certain manufacturing standards (the "2025 CRL"). Atara resubmitted the tab-cel BLA in July 2025, after addressing the manufacturing issues, but it continued to misleadingly tout the results from the ALLELE study submitted in support of the BLA and concealed the full extent of the risks associated with the BLA.

8. The truth finally emerged on January 12, 2026, when Atara announced that the FDA had issued a new CRL, once again denying approval of the tab-cel BLA (the "2026 CRL"). As Atara explained, the FDA denied approval of the BLA in the 2026 CRL because the FDA did not consider "the single arm ALLELE trial ... to be adequate to provide evidence of effectiveness for accelerated approval" and "the trial's interpretability is confounded due to trial study design, conduct, and analysis."

9. The 2026 CRL was promptly published on the FDA's website, and it revealed in detail that the tab-cel BLA suffered from several critical clinical deficiencies that led to the FDA denying approval. Specifically, the 2026 CRL explained that:

> We have concluded that the single arm trial (ALLELE study) is not an adequate and well-controlled study due to deficiencies in study design, conduct and analysis, including choice of external control, unplanned efficacy analysis, high attrition rate, introduction of selection bias, and concomitant treatment interventions which confounded the interpretability of study results. For these reasons, the data

> from the ALLELE study are insufficient to demonstrate substantial evidence of effectiveness of tabelecleucel[redacted] to treat relapsed or refractory EBV+ PTLD.

10. Several of these undisclosed clinical deficiencies, all of which were known or recklessly disregarded by Defendants during the Class Period, rendered Defendants' statements materially misleading when they were made. Among other issues further detailed herein, the extremely small sample size of patients analyzed in the ALLELE study (44), the unexplained and not pre-specified exclusion of 55 patients from treatment and from the ALLELE study analysis, and the lack of clinically meaningful results that were representative of the target population, which severely limited the ability of the study's topline ORR number to demonstrate the efficacy of tab-cel, created a massive undisclosed risk that the FDA would deny the BLA due to a failure to adequately demonstrate the efficacy of tab-cel in the target population.

11. With respect to the sample size, the ALLELE study results submitted with the tab-cel BLA included only ***44 patients*** treated with tab-cel, which severely limited the statistical significance and certainty of the study results and undermined its ability to demonstrate the efficacy of tab-cel for the target population. Even worse, the small sample size of 44 patients was apparently the result of "unplanned changes" from the statistical analysis plan previously provided to the FDA, excluding at least 55 patients from treatment without pre-specification or explanation. Not only was the study underpowered with the small sample size, the unexplained exclusion of 55 patients raised serious concerns for the introduction of selection bias, as the study sponsors may have selected only the patients most likely to respond to the treatment in order to get better results.

12. With respect to the topline ORR results of approximately 50%, which Defendants repeatedly touted throughout the Class Period as supporting the tab-cel BLA, the devil was in the (undisclosed) details. The small sample size (the

denominator of ORR) severely limited the ability of the study's ORR results to be statistically representative of the target population. This problem was accentuated with respect to each of the components of the numerator: CR (which only 12 total patients achieved after treatment) and PR (only 10).

13. On top of that statistical weakness, the patients achieving CRs were disproportionately from lower-risk subgroups (PTLD patients are categorized by varying risk levels), whereas only ***one*** out of thirteen (approximately 8%) of patients in the high-risk subgroup experienced CR. That further shows that the CR results were not representative of the target population.

14. Even worse, the median duration of PR that was observed for those ten patients who achieved PR (as defined in the study) was only ***two months***—meaning at least half of that group had PRs that faded even ***more*** quickly, including as short as ***one day***. As the FDA explained in the 2026 CRL, such a minimal duration of PR was not "clinically meaningful" and thus provided little (if any) support for demonstrating the efficacy of tab-cel. In short, the highly-touted topline ORR result was much greater than the sum of its parts.

15. The end result from the 2026 CRL meant that Atara would need to resubmit the tab-cel BLA yet again, but to do so successfully it must supplement its original data package with additional study results and/or external or historical data, potentially requiring an entirely new Phase 3 clinical trial that would take years (and millions of dollars that Atara did not have) to develop and complete. At a bare minimum, the 2026 CRL meant there would be yet another substantial delay before tab-cel could be potentially approved for marketing and sales in the U.S., upon which Atara's financial success depended.

16. When the market learned that the FDA had issued yet another CRL denying approval of the resubmitted tab-cel BLA, this time based on a multitude of critical clinical deficiencies with the ALLELE study, Atara's stock price plummeted

by $7.79 per share, losing 57% of its value, to close at $5.88 per share on January 12, 2026. Plaintiff and the Class suffered significant losses through their investments in Atara stock and were damaged thereby.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading public filings and statements were made in or issued from this District and the Company's principal executive offices are located in this District. Substantial acts in furtherance of the alleged fraud or the effects of the fraud, including the dissemination of materially false and/or misleading information, have also occurred in substantial part in this district.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, the Internet, and the facilities of a national securities exchange.

## PARTIES

22. Lead Plaintiff Thu Nguyen, as set forth in his certification on file with the Court (Dkt. No. 18-2), and incorporated by reference herein, purchased Atara

common stock at artificially inflated prices during the Class Period and was damaged thereby.

23. Defendant Atara is a Delaware corporation with principal executive offices located at 1280 Rancho Conejo Boulevard, Thousand Oaks, California 91320. The Company's common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "ATRA." Atara conducted a 1-for-25 reverse stock split on June 20, 2024, as "part of the Company's plan to regain compliance with the minimum bid price requirement of $1.00 per share required to maintain continued listing on The Nasdaq Global Select Market," per the Company's press release announcing the reverse split.

24. Defendant AnhCo Thieu "Cokey" Nguyen ("Nguyen") has served as Atara's President and Chief Executive Officer since September 9, 2024. Defendant Nguyen joined Atara in 2021 as Chief Scientific Officer, and added the roles of Executive Vice President and Chief Technical Officer in 2023.

25. Defendant Pascal Touchon served as Atara's President and CEO from 2019 to September 9, 2024, after which he served as the Company's Chairman of the Board of Directors until his resignation from the board on September 2, 2025.

26. Defendant Eric Hyllengren served as Atara's Chief Financial Officer from before the start of the Class Period to March 31, 2025, and as the Company's Chief Operating Officer from October 14, 2024 to March 31, 2025, when he left the Company.

27. Defendant Yanina Grant-Huerta has served as Atara's Chief Accounting Officer since March 31, 2025.

28. Defendants Nguyen, Touchon, Hyllengren, and Grant-Huerta are collectively referred to herein as the "Individual Defendants."

29. Atara is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency

because all of the wrongful acts complained of herein were carried out within the scope of their employment.

30. As senior executives of Atara, the Individual Defendants possessed the power and authority to control the contents of Atara's reports to the SEC, and its press releases, presentations, and other public statements to securities analysts, money and portfolio managers, institutional investors, and other media. The Individual Defendants received copies of the Company's reports, press releases, and other communications alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

31. Atara and the Individual Defendants are collectively referred to herein as "Defendants."

## COMPANY BACKGROUND

### ***How Atara Operates and Derives Revenue***

32. Atara is a clinical-stage biopharmaceutical company focused on developing immunotherapies for patients with solid tumors, hematologic cancers, and autoimmune diseases. The Company's lead product candidate is tabelecleucel (also referred to as "tab-cel" or "Ebvallo"), a T-cell immunotherapy program for the treatment of EBV+ PTLD (among other potential treatment indications the Company was exploring). While the Company had 165 employees at the end of June 2024, shortly after the tab-cel BLA was first submitted, that number had dwindled to just 23 employees by May 2025 (prior to Atara resubmitting its BLA after the 2025 CRL), and down to just 14 by the end of 2025, due to several rounds of mass layoffs.

33. As a clinical-stage company, Atara has yet to obtain approval in the U.S. for any of its immunotherapy candidates. While tab-cel for the treatment of EBV+ PTLD received marketing authorization approval from European regulators for

marketing and commercial sales in Europe, it has not been approved by the FDA for marketing and sales in the U.S.

34. Atara incurred significant operating losses every year since its inception (in 2012) until 2025, when it first realized commercialization revenue from sales of Ebvallo in Europe and significantly reduced its operating expenses by outsourcing the continued development and commercialization of Ebvallo to Pierre Fabre and laying off most of its employees. Atara still had negative cash flows of over $17 million in 2025, where operational negative cash flows of over $50 million far surpassed positive cash flows from investing and financing activities. Atara has never generated revenue from any commercial sales in the U.S.

35. To the extent Atara generated revenue prior to 2025, that money came from selling its stock or from licensing agreements (or similar deals) made on the hope of eventual regulatory approval. As Atara noted in its annual report for 2025: "Since our inception in 2012, we have funded our operations primarily through the issuance of common and preferred stock, issuance of pre-funded warrants to purchase common stock, upfront fees and milestone payments from the Bayer License Agreement [terminated as of July 31, 2022] and the A&R Commercialization Agreement [with Pierre Fabre] and the sale of our ATOM Facility to FDB in 2022."

36. As the Company explained in its SEC filings: "If any of our product candidates fails in clinical studies or does not gain regulatory approval, or if approved, fails to achieve market acceptance, we may never become profitable" and "[o]ur future success is dependent on the marketing authorization of our product candidates."

37. Although Atara had other therapies in development during the Class Period, primarily CAR T programs, they were several years behind tab-cel in terms of commercialization prospects. According to investor presentations in September and November 2024, none of the other treatment programs in Atara's pipeline had even begun Phase 3 clinical trials, and only one other program (a label-expansion

study for tab-cel) had even started Phase 2 trials. In March 2025, Atara announced it was pausing the development of its allogeneic CAR T programs and discontinuing all CAR T operations. As a result, tab-cel was the centerpiece of Atara's business strategy, relying heavily on the therapy's purported promise of success to drive its investor communications and funding efforts.

38. The Company also admitted in each of its annual reports for 2023-2025 that Atara "will require substantial near-term financing to continue operations" (or substantially similar language), and warned of "substantial doubt about our ability to continue as a going concern." Atara repeatedly explained in those reports (in the following, or substantially similar language) that to continue to finance its operations, "we plan to secure additional capital, potentially through a combination of public or private security offerings; use of our ATM facility [providing for the sale of Atara's common stock in "at the market" offerings]; issuance of debt; and/or execution of strategic transactions."

39. Atara partnered with Pierre Fabre for the commercialization of tab-cel. The Company relies in significant part on milestone payments—*i.e.*, financial payments conditioned upon Atara achieving specific developmental targets for tab-cel—from Pierre Fabre, to fund its operations. Atara also relies on certain of Pierre Fabre's services to execute on its business activities, particularly those related to tab-cel's potential regulatory approval.

40. In October 2021, Atara granted to Pierre Fabre an exclusive, field-limited license to commercialize and distribute Ebvallo in Europe and select emerging markets in the Middle East, Africa, Eastern Europe, and Central Asia. In September 2022, Atara amended its agreement with Pierre Fabre, receiving an additional $30 million milestone payment in exchange for a reduction in Atara's royalties and the supply price mark-up on Ebvallo purchased by Pierre Fabre. In December 2022, Atara sold a portion of its right to receive royalties and certain milestones in Ebvallo under

the Pierre Fabre agreement to HCR Molag Fund L.P. ("HCRx") for $31 million, subject to a repayment cap.

41. In October 2023, Atara agreed to expand Pierre Fabre's exclusive license to research, develop, manufacture, commercialize, and distribute tab-cel to include all other countries in the world, in exchange for $20 million. Atara received another $20 million in the deal upon achieving "a regulatory milestone" in April 2024, and another $20 million when the submission of the tab-cel BLA was accepted by the FDA.

42. Defendants thus had an incentive to mislead investors about the risks inherent to the ALLELE study despite its myriad shortcomings. With no real sources of revenue, if Atara did not continue to raise funding from selling its stock to outside investors and submitting (and re-submitting) the tab-cel BLA to qualify for milestone payments from Pierre Fabre, it would struggle to finance its continued operations. Defendants' false and misleading statements helped to inflate or maintain the price of Atara's stock so that the Company could continue to sell its stock to stay afloat.

***<u>Tab-cel and EBV+ PTLD</u>***

43. Epstein-Barr virus (EBV) is an oncogenic virus, meaning it can cause or promote the development of cancer. EBV has been implicated in the development of a wide range of diseases, including lymphomas and other cancers. EBV is widespread among humans—over 90% of the population has EBV antibodies—and typically persists as a lifelong, asymptomatic infection.

44. In healthy individuals, normal immune systems and T cells (a type of white blood cell crucial for the adaptive immune system) keep EBV in check. However, immunocompromised patients, such as those undergoing hematopoietic cell transplants ("HCT," also called a bone marrow or stem cell transplant) or solid organ transplants ("SOT") have a reduced ability to control EBV. This can result in EBV-positive lymphoid proliferation, meaning that white blood cells infected by EBV are multiplying. In some patients, the proliferation of these EBV-transformed

cells can cause an aggressive, life-threatening form of blood cancer called EBV+ post-transplant lymphoproliferative disease ("EBV+ PTLD"). PTLD patients may fall into high-, intermediate-, and low-risk categories for survival.

45. Historical treatment options for EBV+ PTLD after HCT or SOT include reduction in immunosuppression, surgery, radiation therapy, chemotherapy, and rituximab (an anti-CD20 monoclonal antibody therapy that is currently the primary standard treatment for EBV+ PTLD). However, these are risky treatments that can lead to serious complications such as graft-versus-host disease, rejection of transplanted organs, and toxicity, and carry a high rate of treatment-related mortality.

46. In EBV+ PTLD after HCT, up to 50% of patients respond to initial treatment, and for EBV+ PTLD after SOT, over 60% of patients respond. However, the prognosis for patients whose disease does not respond to initial treatment ("refractory"), or who relapse after initially responding to the treatment ("relapsed"), is very poor. The median overall survival time ("OS") for patients relapsed or refractory ("r/r") to rituximab with EBV+ PTLD after receiving HCT is less than one month, and the OS for patients r/r to rituximab with EBV+ PTLD after receiving SOT is approximately four months. The use of chemotherapy in patients with EBV+ PTLD who have failed rituximab is frequently associated with significant rates of treatment-related mortality due to the frailty of the patients and severe toxicities associated with chemotherapy.

47. This is an ultra-rare patient population. Atara estimated that only "several hundred" EBV+ PTLD patients failed rituximab with or without chemotherapy in the U.S. in 2019. Tab-cel is a treatment inteded to improve outcomes for this particular target population of patients.

48. Tabelecleucel is an off-the-shelf, allogeneic, EBV-specific T-cell immunotherapy. That means it uses healthy donor immune cells modified to target

and kill specific cancer cells or virus-infected cells, pre-manufactured and stored in a bank as a ready-to-use treatment.

49. Tab-cel consists of EBV-specific cytotoxic T lymphocytes ("CTLs," which are white blood cells that destroy cancer or virus-infected cells) derived from EBV-seropositive donors. Those CTLs target and eliminate EBV-expressing cells. Tab-cel specifically targets the EBV latency profile commonly expressed in EBV+ PTLD.

50. Tab-cel is manufactured, characterized, and stored in advance of patient need, allowing for rapid delivery from inventory for treatment, in contrast to generating autologous (using the patient's own cells) or donor-derived EBV-CTLs only after a patient is identified as needing therapy.

***The FDA BLA Approval Process***

51. Clinical trials in the U.S. are overseen by the FDA. Biopharmaceutical companies, like Atara, are required to get the FDA's approval before starting any clinical trial involving human test subjects. As a result, biological product developers, including Atara, are frequently in contact with the FDA regarding the drug development plans and ongoing clinical trials.

52. Before testing any biological product candidate, including tab-cel, in humans, the product goes through preclinical testing. Preclinical tests, also referred to as nonclinical studies, include laboratory evaluations of product chemistry, toxicity and formulation, as well as animal studies to assess the potential safety and activity of the product candidate. The product sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical trial protocol, to the FDA as part of the Investigational New Drug ("IND") application.

53. The FDA may impose clinical holds on a product candidate at any time before or during clinical trials due to unacceptable and significant risks to clinical trial

subjects or non-compliance with FDA requirements. If the FDA imposes a clinical hold, trials may not begin, continue or recommence in the U.S. without FDA authorization, and then only under terms authorized by the FDA.

54. Clinical trials for biological product candidates involve the administration of the product to patients under the supervision of qualified investigators, who are generally physicians not employed or controlled by the trial sponsor. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject inclusion and exclusion criteria, and the parameters to be used to monitor subject safety. Each protocol and any amendments to the protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted and monitored in accordance with the FDA's regulations.

55. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- Phase 1. The biological product is introduced into healthy human subjects and tested primarily for safety. In the case of some products for severe or life-threatening diseases, especially when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is conducted in patients.
- Phase 2. The biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage parameters.
- Phase 3. Clinical trials are undertaken to further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk-to-benefit ratio of the product and provide an adequate basis for marketing approval and product labeling.

56. After the completion of clinical trials, the FDA must approve a BLA before any commercial marketing or sales of the product may commence in the U.S. The BLA submission must include, among other things, results of product

development, laboratory and animal studies, human trials, and information on the manufacture and composition of the product.

57. The FDA reviews a BLA submission to determine if it is substantially complete before the agency accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review of the BLA. The FDA reviews the BLA to determine, among other things, whether the proposed product is safe, potent, and/or effective for its intended use, and has an acceptable purity profile, and whether the product is being manufactured in accordance with current Good Manufacturing Practices ("GMP").

58. Before approving a BLA, the FDA also inspects the facilities where the product is manufactured. The FDA will not approve the product unless it determines that the manufacturing processes and facilities comply with GMP requirements and are adequate to assure consistent production of the product within required specifications. Before approval, the FDA will also typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with IND trial requirements and Good Clinical Practice ("GCP") standards.

59. Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the BLA does not satisfy its regulatory criteria for approval and deny approval. If the agency decides not to approve the BLA after its review, the FDA will issue a CRL that describes the specific deficiencies in the BLA identified by the FDA and may include recommended actions to make the application approvable. If a CRL is issued, the applicant may either resubmit the BLA, addressing all of the deficiencies identified in the letter, or withdraw the application.

60. Throughout the drug development process, there are many meetings and other communications with the FDA. These communications include certain milestone meetings—including the End-of-Phase 2 meeting, where a company and the FDA discuss the results of any Phase 2 studies and a company's plans for its

pivotal Phase 3 studies, and the pre-BLA meeting, where a company and the FDA discuss the contents of a forthcoming application to approve a new drug. The development and BLA submission process for tab-cel was no different.

***The ALLELE Study***

61. In December 2017, Atara initiated two Phase 3 studies for tab-cel to support FDA approval for two separate indications: (i) the MATCH study for the treatment of EBV+ PTLD following HCT; and (ii) the ALLELE study for the treatment of EBV+ PTLD following SOT in patients who failed prior treatment with rituximab.

62. In 2019, after discussion and purported "alignment with regulators," Atara combined MATCH and ALLELE into a single study, collectively referred to as the ALLELE study, which consists of an HCT cohort for EBV+ PTLD patients who have failed prior treatment with rituximab, and a single SOT cohort for EBV+ PTLD patients who have failed rituximab, with or without chemotherapy. Atara also expanded the ALLELE study beyond the U.S. to include clinical sites in Europe and Canada.

63. The ALLELE study was a global, multicenter, single-arm, open-label, Phase 3 trial, meaning it was conducted at multiple sites in different countries, all patients in the trial received tab-cel (none received a comparison treatment or placebo), and all patients and researchers knew that the drug being studied was tab-cel.

64. The primary clinical endpoint for the ALLELE trial was the objective response rate ("ORR"). ORR is simply the percentage of patients who saw any improvement after treatment with tab-cel, including patients who had either a complete response ("CR") or partial response ("PR"): ORR = (CR + PR) / (total patients treated).

65. CR means that all signs of PTLD went away after treatment at the final measuring point. It does not mean the disease was cured. PR means the PTLD improved to some extent but did not entirely disappear after treatment.

66. In May 2024, Atara filed the tab-cel BLA with the FDA, primarily based on data from the ALLELE study. While some of the results from the ALLELE study were published in medical journals such as *The Lancet Oncology* (behind a pay wall), they were not well known to investors. The underlying data from the ALLELE study and the full contents of Atara's BLA submission package were not publicly available during the Class Period.

***<u>Undisclosed Deficiencies in the Design, Results, and Analysis of the ALLELE Study, as Submitted in the Tab-Cel BLA Package</u>***

67. In order to support approval, the tab-cel BLA had to adequately demonstrate the efficacy of tab-cel for the intended indications (*i.e.*, treating EBV+ PTLD after HCT or SOT in patients r/r to rituximab). It sought to do so primarily on the strength of the ALLELE study. However, Defendants failed to disclose to investors that the ALLELE study, and its analysis in the tab-cel BLA package, suffered from several critical flaws, and thus the results from the study were woefully insufficient to adequately demonstrate efficacy and support approval of the BLA.

68. The January 2026 CRL rejecting the tab-cel BLA identified several independent deficiencies with the design of the ALLELE study and analysis of its results, as submitted with the tab-cel BLA. In the CRL, the FDA wrote that "we have concluded that we cannot grant final approval [of the tab-cel BLA] because of the deficiencies outlined below."

69. As the FDA summarized:

> To support this BLA, you [Atara, via Pierre Fabre] submitted the results from the ALLELE study, which evaluated the safety and efficacy of Epstein-Barr virus (EBV)-specific T cell immunotherapy (tabelecleuce), in adult and pediatric (2 years of age and older) recipients of

> solid organ transplantation (SOT) or hematopoietic stem cell transplantation (HCT), with relapsed or refractory EBV-positive post-transplant lymphoproliferative disease (EBV+ PTLD), following prior treatments, with primary endpoint of objective response rate (ORR).
>
> ***We have concluded that the single arm trial (ALLELE study) is not an adequate and well-controlled study due to deficiencies in study design, conduct and analysis, including choice of external control, unplanned efficacy analysis, high attrition rate, introduction of selection bias, and concomitant treatment interventions which confounded the interpretability of study results. For these reasons, the data from the ALLELE study are insufficient to demonstrate substantial evidence of effectiveness of tabelecleuce to treat relapsed or refractory EBV+ PTLD.***
>
> [Emphasis added]

70. More specifically, the FDA listed an astounding ***eight*** separate "Clinical Deficiencies" that precluded approval of the tab-cel BLA. Each of these deficiencies was known to, or recklessly disregarded by, Atara and the Individual Defendants. The design of the critical ALLELE study was determined years in advance of the tab-cel BLA submission (and the misleading statements made during the Class Period), and the study results and analysis were likewise available and known to (or recklessly disregarded by) Defendants well in advance of the BLA submission, and certainly by the time of the BLA submission at the start of the Class Period.

71. The ***first*** clinical deficiency identified by the FDA in the 2026 CRL was titled "Choice of control." While it was publicly known that the ALLELE study was a single-arm study, as opposed to a randomized study with a control group, investors did ***not*** know that the "choice of external control was based on historical estimates and assumptions, with a null hypothesis for ORR of 20%, which was not supported by reference to a specific control population." Accordingly, as the FDA explained in the CRL:

> The lack of robust historical data for a control population that is representative of the study population limits the FDA's ability to assess whether the choice of an external comparator for this study is appropriate. The absence of a high treatment response rate in the intention-to-treat (ITT) population, and uncertainties regarding the balance of known and unknown prognostic factors between the treatment arm and the external control, raise significant concerns about the efficacy of the product.

72. The ***second*** clinical deficiency identified by the FDA in the 2026 CRL, under the heading "Quality of the ALLELE study," was titled "Unplanned efficacy analyses with smaller sample size." As the FDA explained:

> Unplanned changes to the sample size in an ongoing single arm study in your revised statistical plan submitted on [redacted], and subsequently revised on [redacted], resulted in reduction in sample size from 99 treated subjects (in 3 cohorts) to 44 treated subjects (in 2 cohorts). Due to lack of pre-specification of this analysis and lack of Type I error control, the results within this submission are considered descriptive and not statistically inferential. The unplanned efficacy analyses may have introduced a random chance of a successful primary efficacy outcome in a smaller data set.

73. As is typical with prospective BLA submissions, Atara and the FDA had been engaged in continual discussions and held multiple meetings regarding the tab-cel BLA for years before it was submitted. Discussions about the data analyses, analysis methods, and the population to be analyzed were critical parts of those discussions. Those discussions included the "statistical plan" referenced in the 2026 CRL—commonly referred to as a Statistical Analysis Plan ("SAP")—that necessarily included the total number of subjects to be enrolled in the study.

74. The 2026 CRL indicates that the original discussions and/or SAP contemplated a total sample size of 130 patients, with at least 99 patients receiving treatment. However, the analysis in the tab-cel BLA included only 44 treated patients. The FDA deemed these major modifications as "unplanned changes" with a "lack of

pre-specification." In other words, the significant reductions in sample size as the SAP was revised were not part of the original plan that the FDA signed off on. Due to the unplanned and unexplained, or insufficiently explained, reductions in sample size, along with a lack of control over Type I errors (*i.e.*, false positives), the results from the ALLELE study that were submitted in the tab-cel BLA were "not statistically inferential," meaning that they could not be fairly used to estimate results for the larger population that the sample was intended to represent.

75. Finally, the last sentence of the above excerpt means that the much smaller sample size meant there was a higher chance that the primary endpoint result was due to random chance, rather than a demonstrated efficacy of the treatment. The critical importance of an adequate sample size here can be illustrated by looking at confidence intervals ("CIs"). Commonly used statistical methods can use the sample result (in this case, the 50% ORR in the ALLELE study) and sample size to calculate a range that contains the true result for the sampled population within a certain probability (typically 95%, *i.e.*, a "95% CI"). For instance, if the 50% ORR result from the ALLELE study had been found in a sample of 130 treated patients, there would be a 95% probability that the true ORR for the total population would fall between 41.1% and 58.9%, a range of 17.8%. Shrinking the sample size to only 44 patients meant that the 95% CI spanned from 34.6% to 65.4%, a range of 30.8%.[2] A smaller sample size meant a much wider CI—a larger range that the true ORR was likely to fall within—and thus less certainty that the 50% ORR result from the ALLELE study accurately represented (or neared) the ORR for the sampled population.

[2] The two-sided 95% CIs described here were calculated using the widely-recognized Clopper-Pearson method.

76. The ***third*** clinical deficiency identified by the FDA in the 2026 CRL, also under the heading "Quality of the ALLELE study," was titled "High attrition rate." As the FDA explained:

> A substantial proportion of ITT population (n=130) with an available matching cell lot were excluded from treatment with any version of the product (55/130; 42%). A smaller subset of ITT population was treated with the intended product version (44/130; 34%). This high attrition rate further challenged data interpretability. The lack of information about subject disposition impacted our ability to assess the reason for high attrition rate, raising further concerns for introduction of selection bias.

77. This meant that, even after 31 of the 130 originally intended patients who had matching cell lots (and thus could potentially be treated with tab-cel) were either not enrolled or excluded from treatment for unknown reasons, leaving 99 patients intended to be treated, 55 of those 99 patients were excluded from treatment for reasons that the BLA submission failed to explain. Without explaining in their BLA submission how or why the majority of intended patients were excluded from treatment (and thus excluded from analysis in the single-arm ALLELE study), Defendants could not demonstrate to the FDA that there was no selection bias (for example, selecting healthier patients who were more likely to respond to tab-cel) confounding the results of the ALLELE study.

78. Failing to explain the reason for shrinking the sample size of treated patients from 99 (or 130) to 44 therefore made it harder for the FDA to determine if the patients in the study were truly representative of the population. Excluding approximately two-thirds of the original ITT population (130 patients) from the ALLELE study analysis in the tab-cel BLA was highly likely to concern the FDA—which typically expects less than 10% of a population to be excluded, especially for indeterminate reasons—and jeopardize the prospects of the FDA approving the BLA.

79. The ***fourth*** clinical deficiency identified by the FDA in the 2026 CRL, under the heading "Persuasiveness and interpretability of the efficacy data," was titled "Limited sample size of complete responders (CR)." As the FDA explained:

> The small number of subjects (12/44 or 27%) who achieved complete response (CR) as the best response post tabelecleucel[redacted] treatment, limits the certainty of the efficacy data.

80. Just as the small sample size and ORR result (22/44) meant a wide range for the 95% CI, as noted above, the 95% CI for the CR result (12/44) in the study was also very wide, spanning 15.0% to 42.8%. This high level of uncertainty was further exacerbated by the following two deficiencies.

81. The ***fifth*** clinical deficiency identified by the FDA in the 2026 CRL, under the heading "Persuasiveness and interpretability of the efficacy data," was titled "Limited durability of partial responders (PR)." As the FDA explained:

> Although PR was observed in 10 of 44 treated subjects, (23%, 95% CI: 11.5-37.8) and contributed to the ORR of 50%, the short median duration of PR (2.04 months, range: 0.03-11.7 months) was not considered clinically meaningful.

82. This means that although some form of a partial response, as defined in the study, was observed in 10 patients, the median duration of that partial response was only ***two months*** (meaning half of these patients had a PR lasting two months or less) and at least one of those patients had a PR lasting for just ***one day***, which was not clinically meaningful. A result that is not clinically meaningful cannot demonstrate the efficacy of the treatment and weakens the benefit-risk relationship that the FDA must weigh.

83. The ***sixth*** clinical deficiency identified by the FDA in the 2026 CRL, under the heading "Prognostic heterogeneity issues affecting interpretability of the efficacy outcomes," was titled "PTLD risk." As the FDA explained:

> Although 30% (13/44) of treated subjects in the study had high-risk PTLD, only 8% (1/13) of this subgroup experienced CR, which suggests that the CRs were observed predominantly in the low-intermediate risk group and not representative of the intended target population.

84. This means that the study's CR results were not representative of the target population, because they were disproportionately found in the low-risk or intermediate-risk segments of the population. This indicates that the CR rate for the target population may actually be significantly lower than the nominal 27% rate from the ALLELE study. This further calls into question the certainty and accuracy of the results of the ALLELE study and undermines the evidence of efficacy for a large swath of the target population (30%) who fall into the high-risk category. That only 12 of the 44 patients observed a CR in the ALLELE study, a statistically weak result at baseline, was further weakened by this skewed distribution between risk categories.

85. As evident from the 2026 CRL, the purported ORR result from the ALLELE study of approximately 50% was, in truth, underpinned by deeply flawed data that was not revealed to investors until the 2026 CRL. Those undisclosed deficiencies were critical for investors to be able to understand the true magnitude of the risk that the FDA would reject the tab-cel BLA. In sum, the denominator of the 50% ORR (44 patients) was concerningly small, and appears to have represented a significant downward deviation from prior representations Atara made to the FDA about the design of the ALLELE study. The numerator of the 50% ORR (12 CR + 10 PR) was also marred by small numbers (begetting substantial uncertainty), unrepresentative CR results, and transient PR results that were not actually clinically meaningful.

86. Taken together, the individual components comprising the purported 50% ORR from the ALLELE study amounted to considerably less probative evidence of efficacy than their nominal sum suggested. Had they been disclosed, these critical deficiencies would give reasonable investors a materially different impression of the

riskiness of the tab-cel BLA than they were able to ascertain from Defendants' misleading statements.

87. The ***seventh*** clinical deficiency identified by the FDA in the 2026 CRL, under the heading "Prognostic heterogeneity issues affecting interpretability of the efficacy outcomes," was titled "Histologic heterogeneity." As the FDA explained:

> The study enrolled subjects with a broad range of PTLD histology, ranging from less aggressive histology, such as follicular hyperplasia, plasmacytoma like B cell type, and marginal zone lymphoma to diffuse large B cell lymphoma, with differing prognostic characteristics, limiting the ability of a small single-arm study to demonstrate treatment effect of your product.

88. In other words, because the small sample size of 44 patients each had a broad range of ways in which PTLD had manifested in the patients' bodies, the lack of a control group (ideally with comparable variances in histology) further limited the ability of the ALLELE study to demonstrate the efficacy of tab-cel for the target population. A larger sample size and/or control group would have allowed subgroup analysis to determine differences in treatment efficacy between patients with these varying histologies.

89. Finally, the ***eighth*** clinical deficiency identified by the FDA in the 2026 CRL was titled "Potential confounders from treatment interventions." As the FDA explained:

> Concomitant treatment interventions, including reduction in immunosuppression and proximity of rituximab therapy to study entry, affected the interpretability of the efficacy results.

90. While the FDA recognized that treatment interventions other than the use of tab-cel as indicated in the ALLELE study protocol were necessary for proper medical care of the patients, they nonetheless introduced further confounding variables that reduced the ability of the FDA to draw strong conclusions as to the

efficacy of tab-cel from the ALLELE study. As the FDA summarized after listing these eight clinical deficiencies:

> It may be challenging for a single arm study to provide robust efficacy data because relapsed or refractory PTLD presents as a prognostically heterogeneous population. We acknowledge inherent confounding factors related to proximity of prior therapies and reduction in immunosuppression are necessary elements of patient care. Nevertheless, these factors carry the potential to confound the assessments for establishing treatment effect of your product. Therefore, a randomized controlled study may be necessary to minimize bias and confounding effects.
>
> We look forward to collaboratively working with you on study design considerations that adequately minimize the confounding [effects] from these factors and reduce the likelihood of biases. ...

91. The FDA also provided additional "observations" on the clinical data supporting the tab-cel BLA, including issues with EBV assessments and cytokine data submitted with the BLA, which the FDA determined could not be used to support regulatory decisions, and variability in dosing cycles that hindered the FDA's assessment of the dose response relationship.

**DEFENDANTS MADE MISLEADING STATEMENTS ABOUT THE ALLELE STUDY AND THE TAB-CEL BLA**

92. The Class Period begins on May 20, 2024, when, during pre-market hours, Atara issued a press release announcing its submission of the tab-cel BLA to the FDA. The press release touted that "[t]he [tab-cel] BLA is supported by pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases including the latest pivotal ALLELE study data that demonstrated a statistically significant 48.8% Objective Response Rate (ORR) ($p<0.0001$) and favorable safety profile consistent with previous analyses."

93. This statement was misleading for multiple reasons. *First*, the statement that the tab-cel BLA "is supported by pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases including the latest pivotal ALLELE study data," misleadingly indicated to investors that the ALLELE study data submitted with the BLA was well-powered, *i.e.*, that it used a sufficiently large sample size to provide strong statistical evidence demonstrating the efficacy of tab-cel for the target population. That was not true.

94. In reality, Defendants knew (or recklessly disregarded) that the ALLELE study data submitted with the BLA had a sample size of just 44 patients, ***one tenth*** of the "430 patients treated with tab-cel," whose clinical data purportedly supported the tab-cel BLA. Moreover, Defendants knew (or recklessly disregarded) that the small sample size was the result of unplanned changes from the SAP previously submitted to the FDA, which lacked pre-specification and Type I error control and thus carried a high risk of being deemed not statistically inferential. This is particularly true due to 55 patients being excluded from the analysis without explanation, introducing potential for bias into the results. As Defendants also knew (or recklessly disregarded), the extremely small sample size of just 44 patients in the ALLELE study analysis submitted with the tab-cel BLA also meant that even the purportedly positive ORR did not provide strong statistical evidence demonstrating efficacy because the study was critically underpowered and the results carried a significant level of statistical uncertainty.

95. Finally, the statement regarding data from "430 patients treated with tab-cel" supporting the BLA also misleadingly implied a broad range of patients, such that histologic heterogeneity among the intended treatment population (especially for an ultra-rare disease) would not compromise the ability of the study to demonstrate a treatment effect. In truth, Defendants knew (or recklessly disregarded) that analyzing results from only 44 patients in the ALLELE study with a broad range of PTLD

histology limited the ability of the study to demonstrate tab-cel's treatment effect. Each of these critical deficiencies materially increased the risk that the tab-cel BLA would not be approved. This statement misrepresented and concealed the true extent of that risk.

96. *Second*, the statement that "the latest pivotal ALLELE study data ... demonstrated a statistically significant 48.8% Objective Response Rate (ORR) (p<0.0001)" misleadingly implied to investors that achieving the primary endpoint of the ALLELE study (a statistically significant ORR, as defined in the study) strongly demonstrated the efficacy of tab-cel and supported a high likelihood of BLA approval. In truth, Defendants knew (or recklessly disregarded) that each of the components of the ORR result were seriously flawed and provided little support for demonstrating the efficacy of tab-cel.

97. To wit, the denominator of ORR (the 44 patients included in the ALLELE study analysis) was critically underpowered, which undermined the statistical significance of the results. The nominator of ORR (CR + PR) also masked critical deficiencies. The low number of patients (12) that achieved CR limited the statistical certainty that could be derived from the analysis, and the fact that only one of the 13 high-risk PTLD patients analyzed in the study achieved CR also showed that the CR results may be skewed toward the lower-risk populations and thus that the overall CR rate was not representative of the intended target population. The extremely short median duration of PR (just ***two months***), and the fact that the partial response for at least five of the ten patients who achieved PR lasted between just ***one day*** and two months, meant the results were not clinically meaningful and thus were insufficient to demonstrate the efficacy of tab-cel. Each of these critical deficiencies—independently, and even more so when considered cumulatively—materially increased the risk that the tab-cel BLA would not be approved. Defendants' statement thus misrepresented and concealed the true extent of that risk.

98. The May 20, 2024 press release also quoted Defendant Touchon as stating, in relevant part:

> The BLA submission for tab-cel represents a significant moment for Atara, our partner Pierre Fabre, and the broader allogeneic T-cell therapy field, and is a critical step towards our goal of delivering this first-of-its-kind treatment to EBV+ PTLD patients in the U.S.

99. The statement that the tab-cel BLA submission "is a critical step towards our goal of delivering this first-of-its-kind treatment to EBV+ PTLD patients in the U.S." was misleading because it falsely implied to investors that the tab-cel BLA carried a high likelihood of FDA approval, which was necessary in order for Atara to "deliver[]" tab-cel "to EBV+ PTLD patients in the U.S." In truth, Defendants knew (or recklessly disregarded) that the tab-cel BLA submission suffered from numerous critical clinical deficiencies, and thus carried a significantly greater risk of not being approved by the FDA than this statement conveyed. This statement thus misrepresented and concealed the true extent of that risk.

100. On July 17, 2024, Atara issued a press release announcing that the FDA had accepted the tab-cel BLA for priority review with a Prescription Drug User Fee Act ("PDUFA") target action date (the date by which the FDA must complete its review and issue a decision on the BLA) of January 15, 2025. The press release stated that: "The [tab-cel] BLA is supported by pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases including the latest pivotal ALLELE study data that demonstrated a statistically significant 48.8% Objective Response Rate (ORR) ($p<0.0001$) and favorable safety profile consistent with previous analyses."

101. This statement was substantially identical to the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 93-97.

102. The press release also quoted Touchon as stating, in relevant part:

> The acceptance of the tab-cel BLA is a significant milestone towards making this first-of-its-kind treatment available to patients in the U.S.

103. This statement was substantially identical to the statement identified in ¶ 98, and it was misleading for each of the same reasons detailed in ¶ 99.

104. On August 12, 2024, Atara issued a press release reporting its financial results and operational progress for the second quarter of 2024 ("2Q24").[3] The press release stated that: "The data package for the [tab-cel BLA] filing includes pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases[.] The BLA submission is supported by the latest pivotal ALLELE study data-cut that demonstrated a statistically significant 48.8% Objective Response Rate (ORR) (p<0.0001) and favorable safety profile consistent with previous analyses."

105. These statements were substantially identical to the statement identified in ¶ 92, and they were misleading for each of the same reasons detailed in ¶¶ 93-97.

106. The press release also quoted Touchon as stating, *inter alia*:

> Building on the recent BLA acceptance with Priority Review for tab-cel, we are making significant progress with the agency towards the target action date of January 15, 2025, while supporting our partner Pierre Fabre with their U.S. launch preparation[.]

107. The statement that Atara was "supporting our partner Pierre Fabre with their U.S. launch preparation" for tab-cel was misleading because it falsely implied to investors that the tab-cel BLA carried a high likelihood of FDA approval, which was necessary in order for Atara and Pierre Fabre to "launch" tab-cel in the U.S. In truth, Defendants knew (or recklessly disregarded) that the tab-cel BLA submission

---

[3] Throughout this complaint, references to "[X]Q[YY]" are to the [X] (first, second, third, or fourth) quarter of the year 20[YY].

suffered from numerous critical clinical deficiencies, and thus carried a significantly greater risk of not being approved by the FDA than this statement conveyed.

108. The press release also announced that Touchon would be stepping down as Atara's CEO and taking the role of Chairman of Atara's board of directors, with Defendant Nguyen assuming the Company's CEO position.

109. Also on August 12, 2024, Atara filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for 2Q24 (the "2Q24 10-Q"). Defendants Touchon and Hyllengren signed the 2Q24 10-Q. The 2Q24 10-Q touted that the tab-cel BLA's "data package ... included pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple diseases."

110. This statement was substantially identical to the first part of the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 93-95.

111. The 2Q24 10-Q also stated that:

> ... the current protocol for our ALLELE study in EBV+ PTLD is designed to rule out a 20% ORR as the null hypothesis. This means that if the lower bound of the 95% confidence interval on ORR among patients receiving at least one dose of tab-cel exceeds 20% at the end of the study, then the study would be expected to meet the primary endpoint for the treatment of PTLD. Assuming enrollment of 33 patients in a cohort of ALLELE, an observed ORR above approximately 37% would be expected to meet the primary endpoint for that cohort.

112. This statement was misleading because, as Defendants knew (or recklessly disregarded), the null hypothesis for ORR of 20% was not supported by reference to a specific control population. Accordingly, the lack of robust historical data in the submitted tab-cel BLA package for a control population that is representative of the study population in the ALLELE study limited the FDA's ability to assess whether Atara's decision to use an external control (in a single-arm study,

rather than a randomized controlled trial, the gold standard for clinical trials) was appropriate. Moreover, using an external control based on historical estimates and assumptions, without reference a specific control population meant that, even for a single-arm study the uncertain balance of known and unknown prognostic factors between the treatment arm of the study and the external control made it very difficult to demonstrate the efficacy of tab-cel. This critical deficiency in the study design and submitted BLA package materially increased the risk that the tab-cel BLA would not be approved. This statement misrepresented and concealed the true extent of that risk.

113. The 2Q24 10-Q also stated that "modifications to the total sample size of the ALLELE study and the statistical approach may be necessary in connection with the review of the BLA by the FDA."

114. This statement was misleading because it materially underplayed the risk that the FDA would require modifications to the sample size of the ALLELE study and the statistical approach for the analysis of that data submitted with the tab-cel BLA. In truth, Defendants knew (or recklessly disregarded) that the ALLELE study data submitted with the BLA had a sample size of just 44 patients. Moreover, Defendants knew (or recklessly disregarded) that the small sample size was the result of unplanned changes from the SAP previously submitted to the FDA, which lacked pre-specification and Type I error control, and thus carried a high risk of being deemed not statistically inferential. This is particularly true due to 55 patients being excluded from the analysis without explanation, introducing potential for bias into the results. As Defendants also knew (or recklessly disregarded), the extremely small sample size of just 44 patients in the ALLELE study analysis submitted with the tab-cel BLA also meant that even the purportedly positive ORR did not provide strong statistical evidence demonstrating efficacy because the study was critically underpowered and the results carried a significant level of statistical uncertainty. Finally, analyzing results from only 44 patients in the ALLELE study with a broad

range of PTLD histology limited the ability of the study to demonstrate tab-cel's treatment effect. Each of these critical deficiencies materially increased the risk that the tab-cel BLA would require modification to the sample size or statistical approach before potentially being approved by the FDA. This statement misrepresented and concealed the true extent of that risk.

115. The 2Q24 10-Q also made the following statement in its discussion of purported "Risk Factors":

> The FDA ultimately may not approve the [tab-cel] BLA based on the data provided, including a concern that the current clinical dataset is insufficient. In this case, the conduct of an additional clinical trial or trials in the lead indication or completing the ongoing ALLELE study may be necessary to support a BLA approval for tab-cel. If the FDA determines that the data package included in the original BLA submission is insufficient and issues a Complete Response Letter, this would result in a considerable delay to a subsequent BLA submission ....

116. This purported risk disclosure was insufficient and misleading because Defendants knew (or recklessly disregarded) that the data provided in the tab-cel BLA package suffered from several critical clinical deficiencies, as detailed above, and thus there was a much higher risk than this statement conveyed of the FDA determining that the BLA submission was insufficient, issuing a CRL, and considerably delaying or effectively foreclosing the resubmission of the tab-cel BLA. That risk was not merely hypothetical when these statements were made; the clinical deficiencies were inherent to the ALLELE study design and the analysis of that data as submitted with the BLA. This purported risk disclosure warned vaguely of a generalized risk that the FDA may not ultimately approve the tab-cel BLA, which is equally true of any BLA submitted to the FDA. It was not sufficient to apprise investors of the true risk presented by the tab-cel BLA *specifically*, which Defendants knew (or recklessly disregarded) suffered from several critical clinical deficiencies and, for those specific

reasons, carried a particularly *high* risk that the FDA would issue a CRL denying approval of the BLA.

117. On September 9, 2024, Atara presented at the H.C. Wainwright 26th Annual Global Investment Conference. In its presentation to investors, Atara stated that: "The [tab-cel] BLA is supported by pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases[.] The latest pivotal ALLELE study data demonstrated a statistically significant 48.8% Objective Response Rate (p<0.0001) and favorable safety profile consistent with previous analyses."

118. These statements were substantially identical to the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 93-97.

119. On November 12, 2024, Atara filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for 3Q24 (the "3Q24 10-Q"). Defendants Nguyen and Hyllengren signed the 3Q24 10-Q. The 3Q24 10-Q stated that: "The data package for the BLA included pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple diseases."

120. This statement was substantially identical to the first part of the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 93-95.

121. The 3Q24 10-Q also stated that:

> ... the current protocol for our ALLELE study in EBV+ PTLD is designed to rule out a 20% ORR as the null hypothesis. This means that if the lower bound of the 95% confidence interval on ORR among patients receiving at least one dose of tab-cel exceeds 20% at the end of the study, then the study would be expected to meet the primary endpoint for the treatment of PTLD. Assuming enrollment of 33 patients in a cohort of ALLELE, an observed ORR above approximately 37% would be expected to meet the primary endpoint for that cohort.

122. These statements were substantially identical to the statement identified in ¶ 111, and they were misleading for each of the same reasons detailed in ¶ 112.

123. The 3Q24 10-Q also stated that "modifications to the total sample size of the ALLELE study and the statistical approach may be necessary in connection with the review of the BLA by the FDA."

124. This statement was substantially identical to the statement identified in ¶113, and it was misleading for each of the same reasons detailed in ¶ 114.

125. The 3Q24 10-Q also made the following statement in its discussion of purported "Risk Factors":

> The FDA ultimately may not approve the [tab-cel] BLA based on the data provided, including a concern that the current clinical dataset is insufficient. ... If the FDA determines that the data package included in the original BLA submission is insufficient and issues a Complete Response Letter, this would result in a considerable delay to a subsequent BLA submission ....

126. This purported risk disclosure was substantially identical to the statement identified in ¶ 115, and it was insufficient and misleading for each of the same reasons detailed in ¶ 116.

127. Also on November 12, 2024, Atara issued an investor presentation for 3Q24, which stated that: "The [tab-cel] BLA is supported by pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases[.] The latest pivotal ALLELE study data demonstrated a statistically significant 48.8% Objective Response Rate (p<0.0001) and favorable safety profile consistent with previous analyses."

128. These statements were substantially identical to the statement identified in ¶ 92, and they were misleading for each of the same reasons detailed in ¶¶ 93-97.

***The FDA Issued Its First CRL for the Tab-Cel BLA***

129. On January 16, 2025, Atara announced its receipt of a CRL from the FDA rejecting the tab-cel BLA, stating that "[t]he CRL was solely related to observations as part of a standard pre-license inspection of a third-party manufacturing facility for EBVALLO."

130. The market's reaction to the foregoing news was immediate and severe. Multiple market analysts following Atara slashed their price target on the Company's stock in response to the CRL. On this news, Atara's stock price fell $5.33 per share, or 40.5%, to close at $7.83 per share on January 16, 2025.

131. Then, on January 21, 2025, Atara announced in a press release that the FDA had placed a clinical hold on the Company's active IND applications—including the IND for tab-cel as a monotherapy treatment for EBV+ PTLD—because of "the inadequately addressed GMP compliance issues" that caused the FDA to issue the CRL regarding the tab-cel BLA, stating, *inter alia*:

> [T]he [FDA] has placed a clinical hold on Atara's active [IND] applications. These INDs include the EBVALLO™ (tabelecleucel) program as monotherapy treatment for adult and pediatric patients two years of age and older with [EBV+ PTLD] .... Screening and enrollment of new participants in both programs have been paused.
>
> The clinical hold for EBVALLO is directly linked to inadequately addressed GMP compliance issues identified during the pre-license inspection of the third-party manufacturing facility referenced in the [CRL] for EBVALLO that was announced on January 16, 2025. ... These issues, which underlie both the CRL and the clinical hold, are specific to the referenced third-party manufacturing facility[.]

132. The market quickly reacted to this news, as Atara's stock price fell $0.52 per share, or 7.91%, to close at $6.05 per share on January 21, 2025.

***Defendants Continued Making Misleading Statements About the ALLELE Study and the Tab-Cel BLA***

133. Despite the declines in the Company's stock price on January 16 and 21, 2025, Atara's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding deficiencies inherent in the ALLELE study and the risks of the tab-cel BLA being rejected.

134. For example, the January 16, 2025 press release continued to tout that: "The [tab-cel] BLA in the U.S. is based on results from the pivotal ALLELE study demonstrating a statistically significant 50% Objective Response Rate (ORR) and a favorable safety profile."

135. This statement was substantially identical to the second part of the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 96-97.

136. On March 7, 2025, Atara filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for the fourth quarter and full year of 2024 ("2024 10-K"). Defendants Nguyen, Hyllengren, and Touchon signed the 2024 10-K. The 2024 10-K contained the following statement about the results from the ALLELE study:

> In January 2024, data from the ALLELE study that was published in *The Lancet Oncology* showed a 51.2% objective response rate .... In May 2024, we filed the BLA with the FDA using a more recent data cutoff in the BLA submission package, ***data from the submission package showed similar ORR of 48.8% was demonstrated among patients in the indicated target population***, consistent with previous analyses.

137. The highlighted statement was substantially identical to the second part of the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 96-97.

138. The 2024 10-K also stated that:

> ... the current protocol for our ALLELE study in EBV+ PTLD is designed to rule out a 20% ORR as the null hypothesis. This means that if the lower bound of the 95% confidence interval on ORR among patients receiving at least one dose of tab-cel exceeds 20% at the end of the study, then the study would be expected to meet the primary endpoint for the treatment of PTLD. Assuming enrollment of 33 patients in a cohort of ALLELE, an observed ORR above approximately 37% would be expected to meet the primary endpoint for that cohort.

139. These statements were substantially identical to the statement identified in ¶ 111, and they were misleading for each of the same reasons detailed in ¶ 112.

140. The 2024 10-K also stated that "modifications to the total sample size of the ALLELE study and the statistical approach may be necessary in connection with the review of the BLA by the FDA."

141. This statement was substantially identical to the statement identified in ¶ 113, and it was misleading for each of the same reasons detailed in ¶ 114.

142. The 2024 10-K also made the following statement in its discussion of purported "Risk Factors":

> If the FDA does not approve the [tab-cel] BLA, this could result in a considerable delay to a subsequent BLA submission or could lead us not to pursue a BLA submission at all. For example, the FDA may not approve the BLA based on the data provided, including a concern that the current clinical dataset is insufficient. In this case, the conduct of an additional clinical trial or trials in the lead indication or completing the ongoing ALLELE study may be necessary to support a BLA approval for tab-cel.

143. This purported risk disclosure was substantively identical to the statement identified in ¶ 115, and it was insufficient and misleading for each of the same reasons detailed in ¶ 116.

144. On May 15, 2025, Atara issued a press release reporting its financial results and operational progress for 1Q25. The press release stated, in relevant part:

> The FDA has lifted the clinical holds on EBVALLO™ studies. Atara plans to resume enrollment in the Phase 3 ALLELE clinical study for patients with [EBV+ PTLD] and the Phase 2 label-expansion multi-cohort clinical study.
>
> The FDA has granted a date in [Q2] 2025 for a Type A meeting to discuss the plan to address the issues raised by the FDA in the [CRL] issued in January 2025, and the path forward for resubmission of the EBVALLO™ BLA.
>
> * * *
>
> ***Atara remains eligible for significant milestone payments from Pierre Fabre Laboratories upon FDA approval of the EBVALLO™ BLA and related commercial sales of EBVALLO™, as well as significant royalties as a percentage of net sales*.**
>
> [Emphasis added.]

145. The statement that "Atara remains eligible for significant milestone payments from Pierre Fabre Laboratories upon FDA approval of the EBVALLO™ BLA" was misleading because it falsely implied to investors that the tab-cel BLA carried a high likelihood of FDA approval, which was necessary in order for Atara to earn the outstanding milestone payments from Pierre Fabre. In truth, Defendants knew (or recklessly disregarded) that the tab-cel BLA submission suffered from numerous critical clinical deficiencies, and thus carried a significantly greater risk of not being approved by the FDA than this statement conveyed.

146. That same day, Atara filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for 1Q25 (the "1Q25 10-Q"). Defendants Nguyen and Grant-Huerta signed the 1Q25 10-Q. The 1Q25 10-Q stated that:

> ... [T]he current protocol for our ALLELE study in EBV+ PTLD is designed to rule out a 20% ORR as the null

> hypothesis. This means that if the lower bound of the 95% confidence interval on ORR among patients receiving at least one dose of tab-cel exceeds 20% at the end of the study, then the study would be expected to meet the primary endpoint for the treatment of PTLD. Assuming enrollment of 33 patients in a cohort of ALLELE, an observed ORR above approximately 37% would be expected to meet the primary endpoint for that cohort.

147. These statements were substantially identical to the statement identified in ¶ 111, and they were misleading for each of the same reasons detailed in ¶ 112.

148. The 1Q25 10-Q also stated that "modifications to the total sample size of the ALLELE study and the statistical approach may be necessary in connection with the review of the BLA by the FDA."

149. This statement was substantially identical to the statement identified in ¶ 113, and it was misleading for each of the same reasons detailed in ¶ 114.

150. The 1Q25 10-Q also made the following statement in its discussion of purported "Risk Factors":

> If the FDA does not approve the [tab-cel] BLA, this could result in a considerable delay to a subsequent BLA submission or could lead us not to pursue a BLA submission at all. For example, the FDA may not approve the BLA based on the data provided, including a concern that the current clinical dataset is insufficient. In this case, the conduct of an additional clinical trial or trials in the lead indication or completing the ongoing ALLELE study may be necessary to support a BLA approval for tab-cel.

151. This purported risk disclosure was substantively identical to the statement identified in ¶ 115, and it was insufficient and misleading for each of the same reasons detailed in ¶ 116.

152. On July 14, 2025, Atara issued a press release announcing its resubmission of the tab-cel BLA to the FDA. The press release stated that: "The [tab-cel] BLA is supported by pivotal and supportive data covering more than 430 patients

treated with tab-cel across multiple life-threatening diseases, including the latest pivotal ALLELE study data that demonstrated a statistically significant 48.8% Objective Response Rate (ORR) (p<0.0001) and favorable safety profile consistent with previous analyses."

153. This statement was substantially identical to the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 93-97.

154. On July 24, 2025, Atara issued a press release announcing the FDA's acceptance of the tab-cel BLA submission. This press release stated that: "The [tab-cel] BLA is supported by pivotal and supportive data covering more than 430 patients treated with tab-cel across multiple life-threatening diseases, including the latest pivotal ALLELE study data that demonstrated a statistically significant 48.8% Objective Response Rate (ORR) (p<0.0001) and favorable safety profile consistent with previous analyses."

155. This statement was substantially identical to the statement identified in ¶ 92, and it was misleading for each of the same reasons detailed in ¶¶ 93-97.

156. On August 11, 2025, Atara filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for 2Q25 (the "2Q25 10-Q"). Defendants Nguyen and Grant-Huerta signed the 2Q25 10-Q. The 2Q25 10-Q stated that: "[i]n May 2025, we aligned with the FDA on ... the path forward for resubmission of the tab-cel BLA at a Type A meeting."

157. This statement was misleading because it falsely implied to investors that Atara had "aligned with the FDA" on the clinical aspects of the tab-cel BLA after resolving the GMP compliance issues with the third-party manufacturer that formed the basis for the 2025 CRL. In truth, Defendants knew (or recklessly disregarded) that the tab-cel BLA submission suffered from numerous critical clinical deficiencies, and thus carried a significantly greater risk of not being approved by the FDA than this statement conveyed.

158. The 2Q25 10-Q also stated that:

> ... [T]he current protocol for our ALLELE study in EBV+ PTLD is designed to rule out a 20% ORR as the null hypothesis. This means that if the lower bound of the 95% confidence interval on ORR among patients receiving at least one dose of tab-cel exceeds 20% at the end of the study, then the study would be expected to meet the primary endpoint for the treatment of PTLD. Assuming enrollment of 33 patients in a cohort of ALLELE, an observed ORR above approximately 37% would be expected to meet the primary endpoint for that cohort.

159. These statements were substantially identical to the statement identified in ¶ 111, and they were misleading for each of the same reasons detailed in ¶ 112.

160. The 2Q25 10-Q also stated that "modifications to the total sample size of the ALLELE study and the statistical approach may be necessary in connection with the review of the BLA by the FDA."

161. This statement was substantially identical to the statement identified in ¶ 113, and it was misleading for each of the same reasons detailed in ¶ 114.

162. The 2Q25 10-Q also made the following statement in its discussion of purported "Risk Factors":

> If the FDA does not approve the [tab-cel] BLA, this could result in a considerable delay to a subsequent BLA submission or could lead us not to pursue a BLA submission at all. For example, the FDA may not approve the BLA based on the data provided, including a concern that the current clinical dataset is insufficient. In this case, the conduct of an additional clinical trial or trials in the lead indication or completing the ongoing ALLELE study may be necessary to support a BLA approval for tab-cel.

163. This purported risk disclosure was substantively identical to the statement identified in ¶ 115, and it was insufficient and misleading for each of the same reasons detailed in ¶ 116.

164. On November 12, 2025, Atara filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for 3Q25 (the "3Q25 10-Q"). Defendants Nguyen and Grant-Huerta signed the 3Q25 10-Q. The 3Q25 10-Q stated that: "[i]n May 2025, we aligned with the FDA on ... the path forward for resubmission of the tab-cel BLA at a Type A meeting."

165. This statement was misleading because it falsely implied to investors that Atara had "aligned with the FDA" on the clinical aspects of the tab-cel BLA after resolving the GMP compliance issues with the third-party manufacturer that formed the basis for the 2025 CRL. In truth, Defendants knew (or recklessly disregarded) that the tab-cel BLA submission suffered from numerous critical clinical deficiencies, and thus carried a significantly greater risk of not being approved by the FDA than this statement conveyed.

166. The 3Q25 10-Q also stated that:

> ... [T]he current protocol for our ALLELE study in EBV+ PTLD is designed to rule out a 20% ORR as the null hypothesis. This means that if the lower bound of the 95% confidence interval on ORR among patients receiving at least one dose of tab-cel exceeds 20% at the end of the study, then the study would be expected to meet the primary endpoint for the treatment of PTLD. Assuming enrollment of 33 patients in a cohort of ALLELE, an observed ORR above approximately 37% would be expected to meet the primary endpoint for that cohort.

167. These statements were substantially identical to the statement identified in ¶ 111, and they were misleading for each of the same reasons detailed in ¶ 112.

168. The 3Q25 10-Q also stated that "modifications to the total sample size of the ALLELE study and the statistical approach may be necessary in connection with the review of the BLA by the FDA."

169. This statement was substantially identical to the statement identified in ¶ 113, and it was misleading for each of the same reasons detailed in ¶ 114.

170. The 3Q25 10-Q also made the following statement in its discussion of purported "Risk Factors":

> If the FDA does not approve the [tab-cel] BLA, this could result in a considerable delay to a subsequent BLA submission or could lead us not to pursue a BLA submission at all. For example, the FDA may not approve the BLA based on the data provided, including a concern that the current clinical dataset is insufficient. In this case, the conduct of an additional clinical trial or trials in the lead indication or completing the ongoing ALLELE study may be necessary to support a BLA approval for tab-cel.

171. This purported risk disclosure was substantively identical to the statement identified in ¶ 115, and it was insufficient and misleading for each of the same reasons detailed in ¶ 116.

172. Appended as exhibits to the quarterly and annual reports that Atara filed with the SEC during the Class Period were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Touchon and Hyllengren (2Q24 10-Q), Defendants Nguyen and Hyllengren (3Q24 10-Q and 2024 10-K), or Defendants Nguyen and Grant-Huerta (1Q25 10-Q, 2Q25 10-Q, and 3Q25 10-Q). In each of these SOX certifications the signors certified that each of the respective reports to which the certifications were attached "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

173. These SOX certifications were misleading because the respective reports to which they were attached *did* omit material facts that rendered certain of the statements contained therein misleading, as identified above.

**PLAINTIFF AND THE CLASS WERE DAMAGED WHEN ATARA's STOCK PRICE PLUMMETED UPON DISCLOSURE OF THE 2026 CRL**

174. Defendants' misleading statements about the ALLELE study results and analysis, as submitted with the tab-cel BLA package, and the risks of the tab-cel BLA being rejected, as alleged above, concealed the true magnitude of the material risk that the FDA would reject the tab-cel BLA due to the existence of several critical clinical deficiencies resulting in the failure of the BLA to adequately demonstrate the efficacy of tab-cel for the target population. That risk ultimately materialized in January 2026, when Defendants announced that the FDA had issued ***another*** CRL rejecting the tab-cel BLA again. As this concealed risk materialized, bringing the truth to light, Atara's stock price collapsed, harming Plaintiff and the Class.

175. The truth finally emerged on January 12, 2026, when, during pre-market hours, Atara issued a press release announcing that the FDA had issued another CRL for the tab-cel BLA, stating, in relevant part:

> The CRL indicates that the FDA is unable to approve the EBVALLO™ BLA in its present form. The BLA was resubmitted in 2025 after reaching alignment with the FDA on the acceptability of the resubmission criteria and fulfilment of the conditions as identified in the first Complete Response Letter dated 15 January 2025 (First CRL).
>
> * * *
>
> [T]he CRL claims that the single arm ALLELE trial ... is no longer considered to be adequate to provide evidence of effectiveness for accelerated approval. Furthermore, the FDA stated that the trial's interpretability is confounded due to trial study design, conduct, and analysis.

176. According to the FDA, in a news release dated September 4, 2025, titled "FDA Announces Real-Time Release of Complete Response Letters, Posts Previously Unpublished Batch of 89," CRLs are released to the public (on https://open.fda.gov/apis/transparency/completeresponseletters/ (the "FDA CRL

website")) in "real-time ... promptly after they are issued to sponsors." The 2026 CRL was publicly available on the FDA CRL website. Investors would have known to look for the 2026 CRL on the FDA's website upon Atara's January 12, 2026 announcement, which noted that the 2026 CRL was "received after market close on 9 January 2026."

177. The disclosure of the 2026 CRL shocked the market. The same day as Atara's announcement, multiple news outlets reported on the 2026 CRL, including *Bloomberg*, *Seeking Alpha*, and *RTTNews*. In reaction to the news of the FDA's second CRL for the tab-cel BLA, this time based on several clinical deficiencies, Atara's stock price plummeted from $13.67 per share to close at $5.88 per share on January 12, 2026, falling $7.79 per share, or 57%, on higher than usual trading volume.

178. The following day, an analyst report from Canaccord Genuity downgraded the investment bank's recommendation on Atara to "hold" from "buy" and slashed its price target on the Company's stock from $25 to $6.

179. On January 21, 2026, an analyst report from Freedom Broker, an affiliate of Freedom Capital Markets that publishes research and trading strategies for retail investors, highlighted the shocking 2026 CRL, which led the analyst to "materially reduce[] our assumed likelihood of approval for EBVALLO, which has led to a sharp cut in projected operating income and expected milestone receipts." As a result, Freedom Broker cut its target price on Atara stock from $16 to $4 and downgraded the stock from Buy to Sell.

180. On March 9, 2026, H.C. Wainwright & Co., an investment bank, announced in a report that it was dropping its analyst coverage of Atara in light of the 2026 CRL, "due to the continued delay of EBVALLO receiving FDA approval in EBV+ PTLD and the dwindling cash resources of the company."

181. The disclosure of the 2026 CRL revealed to investors that the risk concealed by Defendants' misleading statements and omissions—that the FDA may deny approval of the tab-cel BLA based on several critical clinical deficiencies—had materialized. The consequences of the 2026 CRL were that Atara would have to supplement the tab-cel BLA with additional data. To overcome the myriad clinical deficiencies with the ALLELE study results, Atara may have to conduct a new Phase 3 clinical trial entirely, which was not economically feasible for the Company. Even if it were able to collect sufficient supplemental data from external sources, the 2026 CRL meant that any revenues from the sale of tab-cel for EBV+ PTLD in the U.S. would be significantly delayed, and thus the financial prospects for Atara were materially impaired.

## ADDITIONAL SCIENTER ALLEGATIONS

182. Plaintiff alleges that each of the misleading statements identified above was made with Defendants' knowledge, or severely reckless disregard, of the true concealed facts, the omission of which rendered those statements materially misleading.

183. The scienter of the Individual Defendants and other employees and agents of the Company is imputed to the Company under *respondeat superior* and agency principles. This is particularly true with respect to the Individual Defendants, executive officers of the Company who were sufficiently senior in the organization that it is proper to impute their scienter to Atara.

184. During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Atara securities, Defendants caused Atara to sell millions of shares of its common stock, as well as pre-funded warrants to purchase millions more, via direct offerings in September 2024 and May 2025, and sales

through its ATM facilities (agreements allowing Atara to sell its common stock through certain agents in "at the market" offerings). Atara reaped over $60 million in proceeds from these offerings and sales, the vast majority of which occurred during the Class Period.

185. Specifically, in September 2024, Atara raised $35.8 million in net proceeds from a registered direct offering of 758,900 shares of its common stock and pre-funded warrants to purchase 3,604,780 shares of its common stock. In May 2025, Atara issued and sold 834,237 shares of common stock and pre-funded warrants to purchase 1,587,108 shares of common stock, raising $14.8 million in net proceeds. In 2024, Atara sold an aggregate of 492,855 shares of common stock for net proceeds of $9.3 million under its ATM facilities. In 2025, Atara sold an aggregate of 124,424 shares of common stock for net proceeds of $1.5 million under an ATM facility.

186. Moreover, Defendants' advancement of tab-cel towards potential FDA approval, despite the undisclosed material known risks, directly translated to tens of millions of dollars in milestone payments from Pierre Fabre, further incentivizing Defendants to provide, publicly, a misleading and unrealistic assessment of the risks of the tab-cel BLA being rejected.

187. Defendants also had actual knowledge, or acted in reckless disregard of, the true information known to them at the time, the omission of which rendered their statements misleading throughout the Class Period, as alleged above. Tab-cel is Atara's lead product candidate, and its sole product approaching anywhere near regulatory approval in the U.S. Further, as discussed above, tens of millions of dollars in potential future milestone payments from Pierre Fabre hinged on Defendants' ability to advance tab-cel towards regulatory approval and commercialization. As such, the Individual Defendants were undoubtedly laser-focused on the tab-cel BLA, as exemplified by their numerous statements repeatedly reassuring investors as to the procedural progression of the tab-cel BLA submission and the strength of the

ALLELE study results during the Class Period, and misleading them as to the risks of FDA denial of approval due to the deficient ALLELE study design and results.

188. Defendants Nguyen and Hyllengren each also received significant cash bonuses ($51,546 for Nguyen and $42,357 for Hyllengren) simply for having the tab-cel BLA submitted to, and accepted by, the FDA, regardless of whether the BLA was ultimately approved or not. According to the Proxy Statement that Atara filed with the SEC on Schedule 14A on April 25, 2025, the 2024 annual bonuses for all of its executive officers, including Defendants Nguyen, Hyllengren, and Touchon, were based "entirely on corporate performance."[4] Corporate performance, in turn, included a 45% weight assigned to the submission and acceptance of the tab-cel BLA, regardless of its prospects for approval. After applying the corporate performance score, Atara granted Defendants Nguyen and Hyllengren a total of $197,354 and $159,357, respectively, in bonus payments in 2024, including the bonuses based directly on submission of the BLA. These direct, personal, financial payments support a strong inference that Defendants Nguyen and Hyllengren were both: (A) incentivized to submit the tab-cel BLA even if they knew (or recklessly disregarded) that its prospects for regulatory approval were severely hampered by multiple significant clinical deficiencies; and (2) personally involved in, and/or aware of, the undisclosed details of the BLA package submitted to the FDA, including the highly flawed ALLELE study data and analysis.

189. Further supporting the inference that Defendants acted with knowledge, or severe recklessness, in making the alleged misleading statements is the fact that Defendant Nguyen served as the Company's Chief Scientific and Technical Officer (prior to taking on the roles of President and CEO). It is implausible to suggest that Defendant Nguyen, as the former Chief Scientific and Technical Officer and current

---

[4] Touchon was not an executive officer of Atara at this time, but the Proxy Statement explained that "Consistent with historical practice, Dr. Touchon's bonus was to be based entirely on corporate performance."

President and CEO of a biopharmaceutical company that had only 23 employees and one product candidate anywhere near potential commercialization by the time the tab-cel BLA was resubmitted, was unaware of the severe clinical deficiencies in the ALLELE study data and analysis submitted with the BLA, and thus the severity and significance of the undisclosed risks inherent to the BLA. It is likewise implausible that Defendant Touchon, Atara's President and CEO for five years, including during much of the Class Period and the time when the ALLELE study was redesigned and consolidated with the MATCH study, was unaware of the clinical deficiencies in the ALLELE trial design and analysis supporting the BLA, and thus the undisclosed severity of the risk that tab-cel would fail to attain FDA approval based on the tab-cel BLA package Atara submitted.

190. Defendants Touchon and Nguyen also publicly discussed analysis from the ALLELE study on numerous occasions before and during the Class Period, further supporting an inference that they had access to, and were personally aware of (or recklessly disregarded) the ALLELE study results, the underlying data, and analysis, and thus the inherent clinical deficiencies in the tab-cel BLA. For instance, in addition to the various statements alleged herein, Touchon also publicly discussed the interim analysis from the ALLELE study in an Atara press release on November 9, 2020, during an earnings call with investors on August 9, 2021, in an Atara press release on November 4, 2021, and in an Atara press release on January 10, 2022.

191. At bottom, it would be absurd to suggest that the CEOs of Atara, a company whose ability to continue operating depended on the FDA's approval of the tab-cel BLA, were unaware of critical aspects of the ALLELE study and analysis that created an acutely high risk that the FDA would deny approval of the BLA. This is particularly true with respect to the total sample size (44), the fact that more than half of the intended participants in the ALLELE study were excluded from treatment (and analysis) without explanation, the fact that the CR results were not representative of

the target population, and the fact that the PR results were not clinically meaningful due to their extremely short median duration.

192. The clinical deficiencies identified in the FDA's 2026 CRL would have been discussed in detail with Atara at pre-submission meetings with the FDA. For a company as small as Atara, with only 23 employees by the time the BLA was resubmitted, it would be absurd to suggest that the Company's CEOs were unaware of these significant shortcomings with the "pivotal" ALLELE study's design and analysis, and the FDA's potential concerns with the clinical aspects of the BLA, after the Company had engaged in several rounds of discussions with the FDA over multiple years.

## **CLASS ACTION ALLEGATIONS**

193. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of himself and the Class.

194. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Atara's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of Atara common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Atara or its transfer agent and may be notified of the pendency of this action by mail or email, using the form of notice similar to that customarily used in securities class actions.

195. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

196. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

197. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(d) whether Defendants acted negligently, knowingly, or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;

(e) whether the price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

198. Plaintiff will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made public statements of material fact that were false,

misleading, or were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the false and misleading statements and omissions of material fact, the Company's common stock traded at artificially inflated prices during the Class Period; (c) Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying on the integrity of the market price of the Company's common stock and market information relating to the Company, and have been damaged thereby.

199. During the Class Period, the artificial inflation of the Company's common stock was caused by Defendants' material misrepresentations and omissions as described above, causing the damages sustained by Plaintiff and the other members of the Class. Defendants' material misrepresentations and omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, causing the price of the Company's common stock to be artificially inflated at all relevant times, including when Plaintiff and other members of the Class purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed, those disclosures negatively affected the value of the Company's common stock, dissipating the artificial inflation and damaging Plaintiff and other members of the Class.

200. The market for the Company's common stock was efficient at all times during the Class Period for the following reasons, among others:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 516,000 shares of the Company's common stock, or between 6.3% to 10.5% of Atara's total shares outstanding, were traded weekly during the Class Period, permitting a very strong presumption that its shares traded on an efficient market;

(e) During the Class Period, the Company's common stock met the requirements for listing, and were listed and traded on the NASDAQ, a highly efficient and automated market;

(f) The Company was covered by several securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

(g) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

201. Based on the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's common stock shares. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and thus are entitled to a presumption of reliance.

202. Alternatively, Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts

withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

203. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

204. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

## COUNT I

## Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

205. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

206. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

207. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew, or disregarded with severe recklessness, were false and/or misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208. Defendants acted with scienter in that they knew, or disregarded with severe recklessness, that the public statements they made were materially false and misleading; knew, or disregarded with severe recklessness, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents.

209. The Individual Defendants, senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity or misleading nature of the statements set forth above, and intended to deceive Plaintiff and other members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and Class.

210. As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions.

211. Had Plaintiff and members of the Class been aware that the market price of the Company's common stock had been artificially inflated by Defendants' false and misleading statements and by the material adverse information which they did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

212. As a result of the wrongful conduct alleged herein, Plaintiff and members of the Class have suffered damages in an amount to be established at trial.

213. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiff and members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

214. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

215. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations. In performing their responsibilities in their senior positions, they knew the adverse non-public information regarding the Company's business practices.

216. As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

217. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

218. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. The Individual Defendants also had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

219. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray for relief and judgment, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as class representative and Plaintiff's counsel and class counsel;

B. Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class prejudgment and post-judgment interest and their reasonable costs and expenses incurred in prosecuting this action, including reasonable attorneys' fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 10, 2026

**THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*